

FILED

OCT 28 2021

Clerk, U S District Court
District Of Montana
Billings

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff/Respondent,<br><br>vs.<br><br>RAYMOND THOMAS TETZLAFF,<br><br>Defendant/Movant. | Cause No. CR 17-23-BLG-SPW<br><br>ORDER DENYING<br>AMENDED § 2255 MOTION<br>AND DENYING CERTIFICATE<br>OF APPEALABILITY |

This case comes before the Court on Defendant/Movant Raymond Thomas Tetzlaff's motion to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255. Tetzlaff filed his motion pro se. Because one of his claims appeared to require investigation, the Court appointed counsel to represent him. *See* Order (Doc. 162) at 1–2. Tetzlaff filed an amended motion on February 5, 2021. *See* Am. § 2255 Mot. (Doc. 217).

**I. Preliminary Review**

Before the United States is required to respond, the Court must determine whether "the motion and the files and records of the case conclusively show that

1

the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also* Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts. A petitioner "who is able to state facts showing a real possibility of constitutional error should survive Rule 4 review." *Calderon v. United States Dist. Court*, 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolas*") (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases). But the Court should "eliminate the burden that would be placed on the respondent by ordering an unnecessary answer." Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases, *cited in* Advisory Committee Note (1976), Rule 4, Rules Governing § 2255 Proceedings.

## II. Background

In a previous federal case in 2003, Tetzlaff was convicted of possessing methamphetamine with intent to distribute it, a violation of 21 U.S.C. § 841(a)(1), and of possessing a firearm in furtherance of that crime, a violation of 18 U.S.C. § 924(c)(1)(A). *See* Judgment (Doc. 107) at 1, *United States v. Barker*, No. CR 03-29-M-DWM-02 (D. Mont. Feb. 17, 2004).

On March 2, 2017, a grand jury indicted Tetzlaff and two co-defendants—his wife Crystal Busby-Tetzlaff and Sean Patrick Gilmore—on one count of conspiring to possess 500 grams or more of methamphetamine with intent to distribute it, a violation of 21 U.S.C. § 846 (Count 1); one count of possessing 500

grams or more of a substance containing methamphetamine, and 50 or more grams of actual methamphetamine, with intent to distribute it, a violation of 21 U.S.C. § 841(a)(1) (Count 2); one count of being a felon in possession of two semiautomatic pistols, a Taurus and a Walther, a violation of 18 U.S.C. § 922(g)(1) (Count 4); and one count of possessing the same firearms in furtherance of the drug trafficking crimes alleged in Counts 1 and 2, a violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 5). *See* Indictment (Doc. 9) at 2–6.[1] Attorney Kelly Varnes was appointed to represent Tetzlaff. *See* Order (Doc. 7).

Due to his previous federal conviction under 21 U.S.C. § 924(c), Tetzlaff faced a mandatory prison term of at least 25 years if convicted on Count 5, consecutive to any other sentence. *See* 18 U.S.C. § 924(c)(1)(C)(1), (D)(ii) (eff. Oct. 6, 2006). If convicted on Count 1 or Count 2, Tetzlaff would face a mandatory minimum prison term of ten years. *See* 21 U.S.C. § 841(b)(1)(A)(viii) (eff. Aug. 3, 2010). The United States had only to file an Information under 21 U.S.C. § 851 to double that sentence to a mandatory prison term of 20 years. *See* 21 U.S.C. § 841(b)(1)(A) (eff. Aug. 3, 2010). Thus, by filing an Information, convicting Tetzlaff on Count 5 and either Count 1 or Count 2, and proving him responsible for at least 50 grams of actual methamphetamine or 500 grams of a

---

[1] Crystal was named only in Counts 1 and 2. Gilmore was named in Counts 1, 2, 3, and 6 but not 4 or 5.

substance containing methamphetamine, the United States would send Tetzlaff to prison for at least 45 years, or 540 months. Even without filing an Information, merely by proving its allegations in Count 5 and either Count 1 or Count 2, the United States would send Tetzlaff to prison for at least 35 years, or 420 months. Varnes was fully aware that "[t]he possible penalties [Tetzlaff] faces due to the alleged amount of methamphetamine and use of a firearm are extreme." Br. in Supp. of Mot. to Unseal (Doc. 49) at 1.

On June 13, 2017, Varnes filed a motion to suppress evidence obtained from Tetzlaff's shop, apartment, vehicle, and storage unit (Doc. 50). Crystal, represented by Brian Fay, joined in the motion. *See* Notice (Doc. 52). Varnes argued that the warrant application was improperly based on uncorroborated tips from E.H., a witness with no track record, and that no law enforcement officers observed Tetzlaff doing anything wrong. *See* Br. in Supp. (Doc. 51) at 3–4, 4–5, 5–6. He argued that the warrant application failed to disclose a motive for her to inform on Tetzlaff. *See id.* at 4. And he argued that both Tetzlaff and his properties were seized at about 4:20 p.m. and held for too long, as the warrant was not obtained until 8:53 p.m. *See id.* at 3, 6–7.

Due to changes of counsel for each co-defendant, hearing on the motion was continued from July 6, 2017, to September 15, 2017, to November 3, 2017. *See* Orders (Docs. 54, 63, 69).

4

On October 13, 2017, Crystal filed a fully executed plea agreement. *See* C. Tetzlaff Plea Agreement (Doc. 78).

On October 24, 2017, Tetzlaff moved to change his plea.[2] *See* Mot. to Change Plea (Doc. 80). The suppression motion became moot, and the hearing was vacated. *See* Order (Doc. 82).

The following day, the parties filed a fully executed plea agreement. Tetzlaff agreed to plead guilty to Count 2 of the indictment, and the United States agreed to dismiss Counts 1, 4, and 5. By dismissing Count 5 and foregoing its opportunity to file an Information under 21 U.S.C. § 851, the United States gave up the prospect of a 45-year prison sentence for Tetzlaff.

As part of the plea agreement, Tetzlaff acknowledged he possessed at least 1.5 kilograms of actual methamphetamine with intent to distribute it, that he possessed a firearm, and that he was an organizer or leader in a crime that involved five or more participants or was otherwise extensive. *See* Plea Agreement (Doc. 85) at 2 ¶ 2, 3 ¶ 4. The United States agreed to seek a three-level reduction for Tetzlaff's acceptance of responsibility. Both parties waived appeal if the sentence fell within the guideline range found by the Court at sentencing, and each party waived appeal if the sentence departed or varied from the guideline range to its

---

[2] Gilmore did not sign a plea agreement until January 18, 2018 (Doc. 103), about a month before the Tetzlaffs were sentenced.

advantage. *See id.* at 6–7 ¶ 6, 7 ¶ 8.

At sentencing, Tetzlaff's advisory guideline range was 292 to 365 months. Pursuant to 18 U.S.C. § 3553(a), he was sentenced to serve 216 months in prison, to be followed by a five-year term of supervised release. *See* Statement of Reasons (Doc. 122) at 1 § III; Judgment (Doc. 121) at 2–3.

Tetzlaff did not appeal. His conviction became final on March 9, 2018. *See Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). He timely filed a § 2255 motion on February 21, 2019. *See* 28 U.S.C. § 2255(f)(1); Mot. § 2255 (Doc. 159) at 6 ¶ C.

### III. Claims and Analysis

The amended motion supersedes Tetzlaff's *pro se* motion. *See* Order (Doc. 162) at 2 ¶ 3. Counsel asks the Court to "evaluate the claims and arguments raised in Tetzlaff's Attachments and, if deemed to be legally nonfrivolous, instruct the Government to respond accordingly." Am. § 2255 Mot. (Doc. 217) at 2.

Counsel spent a year and a half reviewing Tetzlaff's case file, including the discovery produced to trial counsel by the United States. He investigated and has prepared pleadings that make the best arguments possible. Should counsel's efforts prove unsuccessful, Tetzlaff is not entitled to take the field himself and launch a barrage of Hail Mary passes—much less ask the Court to run downfield to see if it can catch any. Tetzlaff's own claims and arguments will not be addressed.

6

### A. Conflict of Interest

#### 1. Nature of the Claim

Tetzlaff claims counsel Varnes had a conflict of interest because he previously represented Payton Konen ("Konen") in juvenile and misdemeanor proceedings. Varnes acknowledges that he represented Konen and knew her father, Daniel, because they golfed together three or four times at a local country club. *See* Varnes Aff. (Doc. 217-1) at 1–2 ¶¶ 2–3.

The amended motion, however, adds, "Tetzlaff's declaration affirms that Daniel paid Mr. Varnes for Payton's legal bills and that Mr. Varnes, at the time he was representing Tetzlaff, was also working for Daniel Konen or trying to gain this legal work." Am § 2255 Mot. at 6. Presumably Tetzlaff says these things somewhere in the 83 pages of attachments to the amended motion. Aside from Tetzlaff's say-so, counsel does not claim to have evidence that Daniel paid Payton's bills, or that Varnes was working or hoped to work for Daniel. With no explanation of why Tetzlaff would know anything about the relationship between Varnes and Daniel Konen, the Court cannot treat his declaration as evidence.

The question, therefore, is limited to whether Varnes' representation of Tetzlaff was influenced by his prior representation of Konen in juvenile and misdemeanor matters.

7

### 2. Discovery Available to Varnes

The principal item of interest in the discovery the United States produced to Varnes was Detective Korb's application for a warrant to search Tetzlaff's residence, vehicles, and business. Habeas counsel adds some information from other discovery materials.

According to Korb, Tetzlaff's activity first came to light through his connection with Gilmore. Korb had heard Gilmore's name from various people. In mid-January 2017, a confidential informant ("CI") provided information and, on January 19, conducted a controlled buy. In debriefing afterward, the CI said Gilmore's "partner" in the meth business had just bought Gilmore a new truck. The CI also reported seeing a man about six feet tall, with blue eyes and dirty blond hair, with Gilmore in his shop,[3] but did not know whether he was Gilmore's partner. *See* Warrant Application (Doc. 218 at 7–8).

In a traffic stop made during the CI's debriefing, a deputy learned that Gilmore was driving a vehicle owned by "Tesloff" and registered to a construction company. The deputy could not recall whether he told Gilmore he would be contacting "Tesloff" to find out whether Gilmore was authorized to drive the vehicle. *See id.* at 8–9.

---

[3] The presentence report describes Tetzlaff as American Indian or Alaska Native. His photograph shows a man with dark hair and eyes. He is 5'9" tall. *See* Presentence Report at 3; *id.* ¶ 54.

Eight days later, Korb reviewed Verizon records showing text messages sent and received by Gilmore's phone. On January 19, Gilmore sent a text that said, "I just got pulled over in the red truck they might be calling you." The recipient responded, "U ok." Gilmore replied, "yeah its all good I'll be there in a second." Korb did not identify the phone number or the person who responded, "U ok," but Gilmore's phone contained additional text messages to and from Crystal's phone number. *See id.* at 10.

The CI conducted several more controlled buys from Gilmore, with escalating quantities. *See id.* at 9, 10, 11. On February 3, Korb obtained a warrant to search Gilmore's shop. On February 7, 2017, the CI told Korb that Gilmore's "guy was on an airplane" and Gilmore might be out of methamphetamine.

Korb executed the warrant at Gilmore's shop at about 5:00 p.m. on February 7. Gilmore was detained and answered a few questions. He said a tan pickup in the shop belonged to Raymond Tetzlaff. When Korb asked where Tetzlaff was, Gilmore said he was on vacation. *See* Warrant Application at 11–12. Korb asked about Gilmore's address in the Heights, and Gilmore said, "that address was mostly Payton's (Payton Konen) house." Am. § 2255 Mot. at 4. He said Konen was his girlfriend, about 20 years old, and an addict. Konen's grey car was parked outside Gilmore's shop, but she was not there. Her name was not in Gilmore's drug ledger. *See id.* at 5. Korb "asked Gilmore how a 46 year-old can date a 20

9

year-old and he stated they have their ups and downs." *Id.* at 4–5. The grey car was impounded, *see id.* at 5, and Gilmore was arrested, *see id.*; Warrant Application at 12.

That is all Korb had against Tetzlaff when, on February 8, 2017, at about 4:30 p.m., a woman called and said "she wanted to talk to detectives about drugs." Warrant Application at 12. Her name was Erykah Hoffman. She gave a lengthy account of Tetzlaff's drug trafficking since about April 2016, attributing more than 103 pounds to him, including about ten pounds a month entrusted to Gilmore for distribution and a "load car" with 50 pounds in it that was on its way from Las Vegas to Billings. Korb corroborated what she knew of Gilmore, including the locations of his shop and house. *See id.* at 12–14. Hoffman told Korb that she and Tetzlaff learned of the raid on Gilmore's shop while they were on the plane from Salt Lake to Billings the previous day. *See id.* at 13.

Korb's warrant application pointed out some information that might have given Hoffman a motive to lie about Tetzlaff. For example, Korb noted that Tetzlaff had told Hoffman that "she and his wife were just going to have to get along." Korb also said that Hoffman had become pregnant a few weeks earlier and "Tetzlaff made her get an abortion" in Miami on February 3. They then flew to Las Vegas, spent a few days there, and had just arrived back in Billings when Hoffman called in. *See id.* at 13.

10

On February 9, beginning at about 1:00 a.m. and continuing off and on until about 4:12 p.m., Hoffman did a texting simulcast for Detective Korb of Tetzlaff's plans and movements. He appeared, in light of Gilmore's arrest, to be shedding his methamphetamine and guns and obtaining cash to fund a rapid departure from Billings. She also sent Korb a video recording on her phone of herself and Crystal repackaging about four pounds of methamphetamine to hide it. Tetzlaff, she said, always had her videorecord packaging when he was not there to monitor it himself. Korb compared the video to Crystal's Facebook page and believed the woman to be Crystal. He also heard both women talking about Gilmore's arrest. *See id.* at 14–15.

Korb's warrant application stated that Tetzlaff was arrested at about 4:20 p.m. with two loaded pistols on his person. A woman inside the residence saw the officers and slammed the door. Concerned she or others might destroy evidence, officers entered the house, detained and removed all the occupants, and left. They remained nearby to ensure no one entered the house or vehicles. Similarly, officers secured Tetzlaff's business, T2 Insulation, which they had also learned of from Hoffman. *See id.* at 15–16.

Habeas counsel states that "[s]urveillance footage obtained from the Tetzlaff residence indicates that until at least 4:38 p.m., officers were entering and exiting the Tetzlaff residence." Am. § 2255 Mot. at 8. At no point did Hoffman mention

11

Konen. *See id.* at 9.

Korb's application concluded that, "[b]ased on the totality of the circumstances and the accuracy of information provided by Hoffman," he believed he would find evidence of drug possession with intent to distribute at Tetzlaff's house, in his vehicles, and at his shop. Warrant Application at 16. A state district court judge in Yellowstone County countersigned the application and signed a search warrant at 8:53 p.m. on February 9, 2017. *See* Warrant (Doc. 218 at 25).

At some point, Korb went to the Heights and talked to Konen. She told him she was a drug addict and initially did not know, but eventually realized, that Gilmore was trafficking. Her grey car was registered to her father, Daniel. On February 13, 2017, Korb applied for a warrant to search it. Inside, officers found a spoon with methamphetamine residue and cotton. *See* Am. § 2255 Mot. at 5.

Tetzlaff's address book and bank records did not contain the names "Payton" or "Konen." *See id.* at 9.

Tetzlaff alleges no fact supporting an inference that Konen was involved in Gilmore's trafficking, that she was the CI, or that Varnes knew, or even had reason to suspect, she might be more deeply involved than the discovery indicated.

### 3. Adequacy of Counsel's Representation

The Supreme Court requires a habeas petitioner to show that counsel's alleged conflict of interest "actually affected the adequacy of [the defendant's]

12

representation," *Mickens v. Taylor*, 535 U.S. 162, 168 (2002) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348–49 (1980)), or "influenced" counsel's "basic strategic decisions," *id.* at 172 (quoting *Wood v. Georgia*, 450 U.S. 261, 272 (1981)). *Mickens* concerns the prejudice a defendant must show when a trial court is or reasonably should be aware of a potential conflict and fails to inquire into whether new counsel should be appointed. *See id.* at 164. The more familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984), would require Tetzlaff to show it was unreasonable for Varnes to represent him and that there is a reasonable probability he would have prevailed on a suppression motion if represented by competent and conflict-free counsel. *See id.* at 687–88, 694.

Under either standard, Tetzlaff's contentions are puzzling. He asserts that he would have requested new counsel if he had been aware of Varnes' acquaintance with the Konens. *See* Am. § 2255 Mot. (Doc. 217) at 12. Perhaps he would, but that is not enough to undo his conviction. He also claims that Varnes' loyalty to the Konens "resulted in wholesale disregard of Tetzlaff's interests," *id.* at 15. If that were true, it *would* be enough to undo his conviction, but the Court is unable to follow Tetzlaff's reasoning.

"At minimum," Tetzlaff says, "Mr. Varnes failed to interview witnesses and conduct a thorough investigation into video evidence that could have served as grounds for a possible motion to challenge the search warrant of his residence."

13

*Id.* at 15. Tetzlaff says, "It was only after I plead guilty did I find out, that I had a factual basis for suppressing the search of my house. I told Mr. Varnes that I heard, that maybe, there had been a pre-search of my house." *Id.* at 16 (quoting Tetzlaff Supp. Decl. (Doc. 217-3) at 2).

But Varnes *did* file a suppression motion. Tetzlaff says Varnes should have interviewed James Tetzlaff and Georgina Wells and unidentified "neighbors," all of whom were or might have been at or near the residence on February 9. *See* Am. § 2255 Mot. at 17–18 (citing Tetzlaff Decl. (Doc. 217-2) at 11)). As the warrant application itself says officers entered Tetzlaff's properties to clear and secure them before they obtained the warrant, *see* Warrant Application at 15–16, it is not surprising that witnesses might have seen them doing so.

Further, the warrant application does not mention or rely in any way on evidence or contraband seen or found in the home. *See id.* Thus, even assuming an illegal search was conducted while the warrant application was pending, the same evidence "was also acquired at the time of entry pursuant to the warrant," and "that later acquisition was not the result of the earlier entry." *Murray v. United States*, 487 U.S. 533, 541 (1988); *see also, e.g., United States v. Richardson*, 821 Fed. Appx. 750, 751–53 (9th Cir. 2020) (unpublished mem. disp.). Under these circumstances, "[i]nvoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in

14

a *worse* one." *Id.* (emphases in original). Because Tetzlaff does not suggest any connection between alleged illegal police activity at his residence before the warrant was obtained and the search conducted pursuant to the warrant, the independent source doctrine applies, and the alleged illegal activity would not support suppression of the fruits of the search.

Aside from the nonviability of Tetzlaff's theory of suppression, he fails to explain how Konen's interests could have influenced Varnes to cut off investigation prematurely or otherwise disserve Tetzlaff's interests. Tetzlaff's and Konen's interests appear to be virtually unrelated. Habeas counsel provides no hint that Konen had information about Tetzlaff. There is no reason to suspect the CI had any information about Tetzlaff. Presumably, Gilmore had a pretty good idea who the CI was. Yet, after a year and a half to investigate, Tetzlaff does not claim the CI was Konen, much less that Varnes knew that to be the case.

### 4. Conclusion

Tetzlaff fails to explain how Varnes was conflicted or how his previous representation of Konen affected his decisions and advice in Tetzlaff's case. Any reasonable attorney reading the warrant application would probably conclude that Hoffman and the fruits of the search were the keys to the case. Any reasonable attorney reading the indictment and Tetzlaff's criminal history would probably conclude that trial ought to be avoided because the penalties on conviction would

be dire. As explained above, *see supra* at 4, Varnes filed a motion to suppress and articulated three reasonable arguments to support it. The case was resolved before the motion was heard because the parties arrived at an agreement. Tetzlaff has shown neither a legally or factually superior basis for suppression nor that competent, conflict-free counsel would have recognized and made the superior argument.

Tetzlaff's allegations fail to support an inference that Varnes did halfheartedly, or not at all, something that he would have done, or done wholeheartedly, but for his previous representation of Konen. Whether addressed under the standard of *Mickens* or *Strickland*, this claim is denied.

## B. Role in the Offense

Tetzlaff's *pro se* motion asserted that he should not have received a four-level enhancement for his role in the offense because he had only two co-defendants. *See* Mot. § 2255 (Doc. 159) at 4 ¶ 5A; U.S.S.G. § 3B1.1(a) (Nov. 1, 2016); Presentence Report ¶ 27. The amended motion does not appear to press this claim. It contends that Varnes should have explained the enhancement more carefully so that Tetzlaff could make a sounder decision to accept the plea bargain, particularly in view of his mental health issues and lack of psychological evaluation. *See* Am. § 2255 Mot. at 20–23; Plea Agreement (Doc. 85) at 3–4 ¶ 4.

Tetzlaff does not suggest he was not competent to plead guilty. He does not

suggest there is a reasonable probability that a reasonable, competently advised person, aware of the evidence against him, would have chosen to stand trial and risk a mandatory prison sentence of 45 years rather than pleading guilty under the terms Varnes secured. The guideline takes into account *participants* in an offense, not *defendants*, as well as other factors that make an operation extensive. *See, e.g.*, U.S.S.G. § 3B1.1(a) & cmt. nn.1, 3–4. The participants here included not just Tetzlaff, his wife, and Gilmore, but also unindicted persons such as Hoffman, Summer Owensby, "Reuben," "Roberto," "Lance," and anyone else who distributed the multiple-pound quantities of methamphetamine Tetzlaff brought to Montana. *See, e.g.*, Presentence Report ¶ 15; Warrant Application at 13, 15; Am. § 2255 Mot. at 10.

Tetzlaff's allegations do not meet either prong of the *Strickland* test. This claim is denied.

### C. Other Claims

As explained above, the Court will not attempt to glean additional claims from Tetzlaff's attachments.

To the extent the amended motion asserts that Tetzlaff instructed Varnes to appeal but Varnes failed to do so, *see* Am. § 2255 Mot. (Doc. 217) at 23–24, the claim is time-barred, *see Mayle v. Felix*, 545 U.S. 644, 664 (2005); Pro Se Mot. § 2255 (Doc. 159) at 1–6; Letter (Doc. 159-1) at 1 (showing no similar allegation or

"common core of operative facts," *Felix*, 545 U.S. at 664). As Tetzlaff is represented by counsel, the Court need not extend an additional opportunity to excuse the claim's untimeliness.

## IV. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

The Court appointed counsel to give Tetzlaff the opportunity to state a claim based on trial counsel's alleged conflict of interest if it was possible to do so. The amended motion clarifies that no viable claim arises. Tetzlaff fails to explain how his interests conflicted with those of trial counsel's previous client. She might have been a witness against his co-defendant, but there is no reason to suppose she knew anything about Tetzlaff. He fails to identify any reason why loyalty to her might have influenced counsel's decisions and strategy in his case. Tetzlaff

suggests officers conducted a search of his premises before a warrant was issued and assumes counsel's failure to say so had some unspecified relation with the previous client. But, apart from the absence of any conflict of interest, the warrant application did not depend on anything seen or found in the residence, vehicles, or business, so the independent source doctrine would have applied. *See Murray v. United States*, 487 U.S. 533 (1988).

Tetzlaff's claim regarding the four-level enhancement for his role in the offense is meritless. He agreed to the enhancement in the plea agreement, and he does not claim he was incompetent to plead guilty or that counsel's advice to plead guilty was incompetent. A four-level enhancement paled in comparison to the mandatory minimum 35- to 45-year prison term Tetzlaff would have faced without the plea agreement.

There is no reason to encourage further proceedings. A COA is not warranted.

Accordingly, IT IS ORDERED:

1. Tetzlaff's amended motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (Doc. 217) is DENIED.

2. A certificate of appealability is DENIED. The Clerk of Court shall immediately process the appeal if Tetzlaff files a Notice of Appeal.

3. The Clerk of Court shall ensure that all pending motions in this case and

in CV 19-24-BLG-SPW are terminated and shall close the civil file by entering judgment in favor of the United States and against Tetzlaff.

DATED this 28th day of October, 2021.

*Susan P. Watters*
Susan P. Watters
United States District Court